# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHARLOTTE A. FACIANO,        )
                                  )
        Plaintiff,            )
                                  )    No. 10 C 1341
vs.                           )    Magistrate Judge Schenkier
                                  )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,   )
                                  )
        Defendant.        )

## MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Charlotte Faciano, moves for summary reversal and/or remand of a final decision by the Commissioner of the Social Security Administration ("SSA") denying her Disability Insurance Benefits ("DIB"), pursuant to Title II, and Social Security Income ("SSI"), pursuant to Title XVI, of the Social Security Act (the "Act"), 42 U.S.C. § 405(g) (doc. #23). The Commissioner has filed a cross-motion for summary judgment to affirm the decision (doc. #34). For the reasons set forth below, we deny the plaintiff's motion to reverse and remand; and we grant the Commissioner's motion to affirm.

### I.

The federal regulations implementing the Act outline a five-step evaluation process for determining whether a claimant has a disability. 20 C.F.R. § 404.1520(a)(4). These steps, which must be evaluated sequentially, require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or

---

[1]On October 12, 2010, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. ## 26, 29).

combination of impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) any impairment listed in the appendix to the regulations as severe enough to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4). A finding of disability requires an affirmative answer at either Step 3 or Step 5. 20 C.F.R. § 404.1520(a)(4). A negative finding at any step other than Step 3 precludes a finding of disability. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The burden of proof is on the claimant except for Step 5, where the Commissioner must prove that significant numbers of jobs are available in the national economy for an employee of the claimant's ability. 20 C.F.R. § 404.1520(g) (1).

On appeal, the Court may not decide facts anew, re-weigh evidence, or substitute its own judgment for that of the ALJ. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). That said, while judicial review of ALJ decisions "is deferential, it is not abject." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). We uphold an ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). Although the ALJ is not required to address every piece of evidence or testimony presented, the Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker*, 597 F.3d at 921 (internal citations omitted).

## II.

Our analysis of the pending motions begins with the procedural history of this case. Ms. Faciano applied for DIB and SSI on May 8, 2007 (R. 113-124), alleging April 27, 2007 as her onset date of disability (R. 115, 122). Her applications were denied initially on September 4, 2007 (R. 40-41), and again upon reconsideration on January 7, 2008 (R. 42-43). Thereafter, Ms. Faciano filed a timely request for a hearing, which was granted. The hearing took place before Administrative Law Judge ("ALJ") Mary Ann Poulos on March 20, 2009 (R. 5-39). At the hearing, the ALJ heard from Ms. Faciano, as well as her attorney, Michael Rotman, and a vocational expert ("VE"), William J. Schweihs (R. 7, 101).

On May 14, 2009, the ALJ issued a lengthy decision (R. 47-55), finding that Ms. Faciano was not disabled as of the May 8, 2007 date of her applications. In that decision, the ALJ found that Ms. Faciano had the residual functional capacity ("RFC") to perform light work as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she must have the option to sit and stand at will; she may only occasionally perform fine and gross manipulations; and she must avoid concentrated exposure to environmental irritants (fumes, odors, dust, gases, and chemicals) (R. 50, 53-55). The ALJ further found that jobs consistent with this RFC exist in substantial numbers in the economy (R. 54-55).

On May 26, 2009, Ms. Faciano appealed the ALJ's decision by seeking a request for review by the Appeals Council of the SSA (R. 110). On December 21, 2009, the Appeals Council denied the request for review, making the ALJ's decision the final decision of the Commissioner in this case under 42 U.S.C. § 405(g) (R. 1-4). *See Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III.

We now summarize the administrative record. We set forth the evidence from Ms. Faciano's hearing testimony concerning her personal background and medical complaints in Part A, and then summarize the objective medical history evidence in Part B.

### A.

Ms. Faciano was born on December 6, 1960 (R. 122). She is 5'7" tall, and she weighed 192 pounds at the time of the administrative hearing on March 20, 2009 (R. 10). In 2007, at the alleged onset date, she weighed approximately 226 pounds (R. 10). Ms. Faciano testified that her weight loss was due to irritable bowel syndrome. Ms. Faciano has a high school diploma and she attended one year of junior college (R. 11). She lives in a house with her daughter, who was 18 years old at the time of the administrative hearing (R. 10). She has a driver's license, but she does not drive very often (R. 14-15).

Ms. Faciano last worked on or near April 26, 2007 as an office clerk. She held this position for almost six years (R. 165) at Supreme Screw Products (R. 12). Ms. Faciano testified that her employer, "laid [her] off" because she was "at home or the emergency room or hospital more than [she] was at work" (R. 11; 12). Prior to that time, Ms. Faciano worked as a waitress for almost nine years (R. 165) and a part-time evening and weekend bartender at a bowling alley for about a year and a half (R. 12).

Ms. Faciano claims that she is disabled based on the following impairments: asthma/chronic obstructive pulmonary disease (including atelectasis of lungs); diverticulosis and diverticulitis; lipoma tumors; partial opacification (stomach)/ irritable bowel syndrome; fibromyalgia and carpal tunnel syndrome (bilateral with neuropathy in both hands and arms) (R 50, 145-154, 213-216). Ms.

4

Faciano also alleged that her daily functioning is "very limited" (R. 51), because she must visit the bathroom 15-16 times each day, due to her irritable bowel syndrome, and she must lay down almost all day due to pain and fatigue (*Id.*). Ms. Faciano further claimed that she is disabled due to the symptoms stemming from the impairments identified above (*Id.*).

## B.

We now turn to address the medical evidence related to each claimed impairment.

The administrative record contains documents confirming that Ms. Faciano suffers from asthma (R. 397-98; 401-402), as well as chronic obstructive pulmonary disease ("COPD") (R. 340, 351, 395).[2] On or about April 28, 2007 (the day after her alleged onset date for disability), Ms. Faciano was admitted to the hospital complaining of chest pain and a cough. Upon admission, a portable chest study was done, which showed "no acute process in the chest" and "mild scarring at the left lung base" (R. 406). Ms. Faciano was treated by two specialists: Dr. A. Sosenko, a pulmonary specialist; and Dr. S. Divenere, an ear, nose and throat specialist ("ENT"). Dr. C. Goldman was Ms. Faciano's primary physician. In an assessment, dated May 3, 2007 (R. 400), Dr. Divenere noted that results from a CAT scan of the sinuses revealed a mild left acute maxillary sinusitis. His impression was sinusitis, cough, and laryngopharyngeal reflux (R. 399). Dr. Divenere recommended medications and follow up.

---

[2] It appears that Ms. Faciano does not suffer from "atelectasis of the lungs" (R. 404). "Atelectasis" of the lungs is a condition, when described as "acute," which involves lack of gas exchange within alveoli (tiny, air-filled sacs arranged in clusters in the lungs), due to alveolar collapse or fluid consolidation, in part or all of one lung. It is a condition where the alveoli are deflated. *See Wikipedia*, http://en.wikipedia.org/wiki/Atelectasis It is a very common finding in chest x-rays and may be caused by normal exhalation or by several medical conditions. Acute atelectasis may occur as a result of a deficiency of surfactant (a lipoprotein secreted by the alveolus cells that help maintain the stability of pulmonary tissue).

In another consultation, Dr. A. Sosenko noted that Ms. Faciano had a history of asthma with "mild to moderate diffuse wheezes" (R. 402). Dr. Sosenko ordered a pulmonary function study, which revealed "no acute pulmonary process" and "minimally acute sinusitis of the left maxillary" (R. 395). The "spirometry"[3] tests were normal (R. 404), thus ruling out a diagnosis of acute atelectasis of the lungs[4]; the pulmonary tests showed that there was no obvious obstruction in the chest (R. 402, 404). The spirometry test was performed to rule out COPD (R. 402), but it appears that another test that would have been performed as part of the "pulmonary function study" ordered by Dr. Sosenko, the "maximum voluntary ventilation" ("MVV"), could not be performed because of her cough and "apparent chest pain" (R. 404). Ms. Faciano was discharged on May 4, 2007. Ms. Faciano was given various medications for her asthmatic condition upon discharge (R. 395, 399, 402). The discharge order by Dr. Goldman indicated diagnoses of atypical chest pain, acute bronchitis, and chronic obstructive pulmonary disease (R. 395).

There also is some medical evidence in the record indicating that Ms. Faciano suffers from rheumatoid arthritis. A bone density x-ray/test performed on July 18, 2007, revealed normal bone density, but showed patella femoral narrowing in both knees, the right worse than the left (R. 542; 550); and an MRI for rheumatoid arthritis, performed on August 27, 2007, showed mild degenerative changes that were non-erosive and thus yielded negative results (R. 543; 545). However, on August 24, 2007, a Disability Determination Bureau ("DDS") medical consultant completed a physical

---

[3]"Spirometry" means "the measure of breath" and is a pulmonary function test. It measures lung function, specifically the measurement of the amount (volume) and/or speed (flow) of air that can be inhaled and exhaled. It is an important tool used for assessing conditions such as asthma. *See* http://en.wikipedia.org/wiki/Spirometry.

[4]Although the SSA requested the medical records from Saint Joseph with particular emphasis on any notes relating to "acute atelectasis" in both lungs, especially pulmonary function reports with tracings (R. 393), the medical documents sent by Saint Joseph in response, as described above, reveal normal pulmonary function tests, in particular the spirometry tests (R. 404).

residual functional capacity assessment form, noting – among other things – a "history of rheumatoid arthritis" (R. 53).

The medical evidence of carpal tunnel syndrome shows some worsening in Ms. Faciano's condition. For example, in August 2007, DDS consultant, Dr. C. Ezike, had only noted "mild diffuse finger tenderness" with a grip of 3/5 bilaterally (R. 567-70). Subsequent medical evidence from diagnostic testing in February and March 2009 indicates that Ms. Faciano suffers from moderate to severe bilateral carpal tunnel syndrome, more severe in the right side and less severe in the left side (R. 817, 905). Nerve conduction and EMG studies were performed on February 11 and March 5, 2009, respectively; they revealed neuropathy (nerve disease or disorder) of moderate severity in the right median wrist (R. 817, 905). The physical examination also revealed mild swelling in the right hand. The diagnosis was carpal tunnel syndrome in the right hand greater than the left (R. 905). Carpal tunnel release surgery was recommended (R. 817).

There is no objective medical evidence of fibromyalgia. In February 2009, Ms. Faciano was, as stated, given a nerve conduction test and an EMG. These tests were done on the right upper extremity, not the left side of her body. The test results are contained in the record but not given in narrative form and thus cannot be interpreted (R. 906). In August 2007, Dr. Ezike, the DDS consultant, noted mild diffuse tenderness in her shoulders bilaterally with mild bilateral knee swelling and mild medial tenderness (R. 570). His diagnosis did not include fibromyalgia (R. 570, 572). Similarly, the January 4, 2008 consultation by the state examiner did not include a diagnosis of fibromyalgia (R. 597).

Although there is some objective medical evidence that Ms. Faciano suffers from Diverticulosis and/or Diverticulitis, commonly known as irritable bowel syndrome, the evidence

uniformly shows that this condition is mild. For example, a CT scan of her abdomen and pelvis in response to an emergency room visit for severe abdominal pain, performed on March 13, 2007, resulted in findings of "no acute abnormality" and "no CT evidence of acute diverticulitis or other focal inflammatory process" (R. 268). There also was no intestinal or urinary tract obstruction (R. 268). This CT scan did indicate "colonic diverticulosis" but said no more than that (R. 268). Another CT scan was performed of the abdomen and pelvis on April 21, 2007 (R. 884). This test showed "mild sigmoid diverticulitis" (R. 884). On September 5, 2008, a third CT scan was done indicating a small area of localized inflammation; but "[t]he remainder of the stomach appears normal" and the "proximal small bowel is normal" as well as the pancreas (R. 884). The kidneys were also found normal with "bilateral function without evidence of obstruction" (R. 885). When a rectal enema was given there was "mild wall narrowing of a loop of sigmoid colon in the left lower quadrant" with "mild infiltration of the peri-colonic fat" as seen on the April 21, 2007 study, but there was "no additional localized inflammation" and "no focal small bowel abnormality" (R. 885). In addition, there was no dilated large or small bowel issues. The overall impression was "redundant colon. Diverticulosis with an area of focal inflammation . . . of sigmoid colon in the left lower quadrant. Findings suggest mild diverticulitis or focal colitis. There is no perforation or abscess identified. There is no focal mass or evidence of obstruction" (R. 885).

IV.

We turn now to a review of the administrative hearing testimony and the ALJ's written opinion. We begin with the administrative hearing testimony in Section A and follow with the written opinion in Part B.

8

**A.**

At the administrative hearing, held on March 20, 2009, the ALJ called a VE to give testimony on whether a person with Ms. Faciano's RFC could perform any substantial gainful activity, as defined by the controlling statute and regulations (R. 7-39).

In a series of very precise hypothetical questions regarding the RFC limitations identified for Ms. Faciano, the ALJ elicited testimony by the VE which provided evidence for the ALJ's ultimate finding that Ms. Faciano could not do her past relevant work, but she could perform a limited range of light, unskilled work that existed in substantial numbers in the local/regional economy. Specifically, the ALJ asked the VE to "assume first a person of the Claimant's age, education and work experience" with "skills that [are] limited to light work" who must "avoid[] concentrated exposure to environmental irritants like fumes, odor, dust, gases, chemicals" (R. 34). The ALJ asked the VE to further assume that this person would be "allowed a sit, stand option at . . . will, but that doesn't take [this person] off task more than 10 percent of the time – while they're sitting and standing." The question put to the VE was whether that person would be able to do any of Ms. Faciano's past work. The VE's answer was "no" (R. 34).

The ALJ then asked the VE whether there was "any other work in the regional or national economy that a person with those limitations and vocational factors could perform," and the VE answered "yes," stating that this person would be able to perform "some office clerical positions, particularly . . . some file clerk work . . . and telemarketing positions" as well as "cashier work" (R. 34). In response, the ALJ carefully addressed the question of "how many jobs" existed in this area with those limitations. The VE testified that "2 to 3,000" existed for office and clerical positions;

9

"at least 3,000" for "telemarketing *with a sit, stand option*" and "at least 4 to 5,000" for the "cashier positions" (R. 34) (emphasis added).

Next, the ALJ addressed whether the same jobs would be available, again specifically with a sit-stand option, if the VE were to assume the limitation of sedentary rather than light work (R. 36). The VE testified that the same jobs and the same numbers of jobs would exist at the sedentary exertional level as well.

Finally, the ALJ asked the VE to assume the same limitations but to add the limitation of only occasional fine or gross manipulation. The ALJ asked the VE whether, with this additional limitation, the number of sedentary or light jobs would be reduced (R. 360), and the VE answered that it would, in fact, eliminate the office/clerical jobs (R. 36), and "would affect" the cashier positions, as well, because fine finger movements are required to make change and count bills (R. 36). The VE specifically testified, however, that the manipulation limitation "would not materially affect the telemarketing positions" (R. 36).

The ALJ then asked the VE whether any other jobs existed "that could take [the] place" of the two jobs that had been eliminated or materially reduced by the occasional fine and gross manipulation limitation. The VE answered "yes" and testified that at the same exertional levels of light and sedentary work, the person with the previously identified limits on fine and gross manipulation, could perform "information clerk positions and gate guard receptionist type work" (R. 36). The VE testified that there are approximately two to three thousand jobs for each of those positions (*Id.* at 36-37).

Next, it was Ms. Faciano's turn to question the VE. Although unrepresented and proceeding *pro se* in this Court, Ms. Faciano was represented by an attorney during the administrative hearing

10

through the Commissioner's final decision in this case. Thus, Ms. Faciano's attorney had the opportunity to cross-examine the VE about the then hypothetical RFC and limitations posed by the ALJ. During this cross-examination, Ms. Faciano's attorney added an additional limitation to the sit/stand limitation that the ALJ carefully made part of each hypothetical the VE was asked to consider: a "lying down" limitation to the hypothetical that the ALJ had not included. The question and answers were as follows:

| | |
|---|---|
| ATTY: | . . . do any of the jobs you've described have a sit, stand and lying down option? |
| VE: | No, sir. |
| ATTY: | Okay. You described the telemarketing job, doesn't that require holding the phone and dialing a phone number? |
| VE: | No, many of these positions, or most of them would have an automatic dialer on it, particularly those that are the type that I'm referring to unskilled that are outgoing and incoming or automatically provided for. |
| ATTY: | And you feel – but you don't feel you could have the sit, stand or lying down option at that job? |
| VE: | Correct. |
| ATTY: | All right. I have nothing further. |
| ALJ: | And are the jobs you cited and the testimony consistent with the Dictionary of Occupational Titles? |
| VE: | Yes, Your Honor. |
| ALJ: | Okay. Then I am going to make my [d]ecision in this case and I'll send a copy of that [d]ecision to both of you. |

(End of Testimony) (R. 38).

## B.

The ALJ issued her written opinion on May 14, 2009. At Step One, the ALJ found that Ms. Faciano met the insured status requirements, and had not engaged in substantial gainful activity since the alleged onset date (R. 49). At Step Two, the ALJ found that Ms. Faciano suffered from severe impairments of asthma/COPD, diverticulitis/irritable bowel syndrome, and fibromyalgia/rheumatoid

11

arthritis, as these impairments "impose more than minimal limitations on the claimant's ability to perform the full range of basic work-related activities (*Id.*). At Step Three, the ALJ found that these impairments, while severe, do not meet or medically equal a listed impairment (*Id.* at 49-50).

The ALJ then turned to Ms. Faciano's RFC. After a careful review of the record, the ALJ found that Ms. Faciano is limited to light, unskilled work (R. 54). The ALJ found further limitations on this RFC, namely that Ms. Faciano must have the option to sit and stand at will; only occasionally perform fine and gross manipulations; and avoid concentrated exposure to environmental irritants (fumes, odors, dust, gases, and chemicals) (*Id.* at 50).

Using this RFC, at Step Four the ALJ found that Ms. Faciano cannot perform her past relevant work as a waitress and bartender, as well as in a warehouse (R. 54). At Step Five, the ALJ found that, "considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform" (R. 54). Based on the limited light work RFC with the additional limitations noted, the ALJ relied upon the testimony of the VE to find that Ms. Faciano could perform three types of jobs in the regional economy, namely, telemarketer (3,000 jobs); information clerk (2,000 to 3,000 jobs); and gate guard/receptionist (2,000 to 3,000 jobs). The VE testified that these jobs had three breaks, and would allow for one or two additional bathroom breaks (R. 37). These jobs existed in equal and significant numbers at the sedentary and light level (R. 35-36, 54-55).

## IV.

The principal issue presented in this case is whether the ALJ erred in her RFC determination, and as a result erred at Step Five. Ms. Faciano argues that the ALJ mistakenly found her allegations of limiting pain to be without credibility (Pl.'s Mem. at 5-6), and thus the RFC does not take into

12

account her need to lay down during the day (due to pain and fatigue) or take repeated trips to the bathroom (due to irritable bowel syndrome) (Pl.'s Mem. at 9-10). Ms. Faciano states: "I find it hard to believe that there is a question of credibility in my pain level after careful consideration of my statements, Dr. Ezike's diagnosis and the diagnosis of Dr. Sakeba N. Issa, . . . ." (*Id.* at 6). Ms. Faciano therefore asserts that the ALJ erred at Step Five in deciding that, with an RFC that does not include a requirement that she lay down during the day, there exists substantial numbers of jobs that she can perform.

In addition, Ms. Faciano argues that this case should be remanded for consideration of "new substantial medical evidence" (*Id.* at 10-11). We address each of her arguments in turn.

### A.

When it comes to assessing a claimant's credibility, the Seventh Circuit defers to the ALJ's credibility findings. *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir. 2009). Since the ALJ is in the best position to make a determination on a witness's truthfulness and forthrightness, a court will not overturn an ALJ's credibility determination unless it is "patently wrong." *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004).

When evaluating a claimant's credibility, the regulations require that an ALJ must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p. An ALJ's determination concerning a claimant's credibility must contain specific reasons for the credibility determination, supported by

13

the evidence in the record, and must be specific enough for any subsequent reviewers and the claimant to know what weight the ALJ gave the claimant's statements. *Id.*.

In determining a claimant's credibility, the ALJ must evaluate her claims regarding her symptoms and pain. 20 C.F.R. § 404.1529. The regulations state that a finding of a disability includes an assessment of whether a claimant's symptoms and complaints of pain are consistent with objective medical evidence and other sources of evidence. *Id.* While a claimant's subjective complaint of symptoms and pain alone will not be enough to support a disability finding (*id.*), evaluating a claimant's statements of pain in light of the objective medical evidence may be difficult since pain is not so well understood for a given individual to simply read the severity of the pain from a medical report. *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). However, an ALJ "cannot disbelieve [a claimant's] testimony solely because it seems in excess of the 'objective medical testimony.'" *Schmidt v. Barnhart*, 395 F.3d 737, 746–747 (7th Cir. 2005).

Furthermore, a claimant need not establish objective evidence of the pain itself. *Duncan v. Secretary of HHS*, 801 F.2d 847, 853 (8th Cir.1986). The ALJ must first examine whether the objective medical evidence supports a finding of an underlying medical condition. *Id.* If it does, then the ALJ must next evaluate whether the "objective medical evidence confirms the severity of the alleged pain arising from the condition" or that "the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.*

In her written opinion in this case, the ALJ found that Ms. Faciano's statements about the intensity, persistence, and/or functionally limiting effects of pain or other symptoms were not substantiated by the objective medical evidence (R. 50-51). In particular, the ALJ found that her statements regarding limited daily functioning due to irritable bowel syndrome were not corroborated

14

by the "medical records" which included "progress notes from claimant's treating physicians"and did not mention that Ms. Faciano was required to use the restroom up to 15 or 16 times per day (*Id.*). Similarly, with regard to Ms. Faciano's allegations that she had to "lay down almost all day" due to "pain and fatigue[,]" the ALJ commented on the absence of corroboration for that assertion. Moreover, the ALJ stated that, "even if the claimant's daily activities" were as limited as she alleged, "it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence . . . ." (R. 51). The ALJ concluded by stating: "Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision" (*Id.*).

After careful review of the governing case law on the issue of credibility, as well as the written opinion of the ALJ and the medical record, the Court finds that the ALJ's credibility findings are not patently wrong.

*First,* the ALJ provided a reasonable basis for rejecting Ms. Faciano's allegation that she needs to be able to visit the restroom up to 15 or 16 times a day due to her claimed irritable bowel syndrome (R. 50-51). The medical record does not reveal any findings that are consistent with this exceptionally high level of bathroom use. The ALJ pointed out that the "progress notes from the claimant's treating physicians contain no mention" that Ms. Faciano revealed this level of bathroom use to the many doctors who saw her, diagnosed her, and treated her (R. 51). It was reasonable for the ALJ to infer that the progress notes would have recorded this kind of complaint had it been made. The ALJ did not commit patent error in finding a lack of credibility in Ms. Faciano's testimony about her level of bathroom use, which was inconsistent not only with the medical findings, but also with her contemporaneous complaints to doctors.

*Second,* the ALJ's finding that Ms. Faciano's asserted need to lay down "almost all day" lacked credibility is not patently wrong. The ALJ explained that finding as follows:

> . . . the claimant described very limited activities of daily living and stated that due to pain and fatigue, she lays down almost all day. Although the claimant described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.

(R. 51). We read this statement to mean that, first, Ms. Faciano did not have any corroborating evidence, such as a family member witness, who could confirm that she spends most of the day lying down. But, more importantly, second, the ALJ found that even if Ms. Faciano's statements that she lays down most of the day are found credible, the objective medical evidence does not support a finding that this is the result of pain or fatigue.

In other words, if Ms. Faciano were, indeed, spending most of the day laying down due to pain and fatigue from one of her identified severe impairments, it is reasonable to expect that she would have reported this fact to one of the many doctors on one of the many medical visits that are chronicled in this large, two-volume administrative record. But, none of the medical records indicate that Ms. Faciano reported a need to lay down all or most of the day. Thus, it was reasonable for the ALJ to find that the medical records failed to reflect impairments that are consistent with a level of pain and fatigue that would require a person to lay down, as Ms. Faciano testified (R. 25), ten or more hours each day.

Thus, fairly read, the ALJ's statement that "it is difficult to attribute [the] degree of limitation [alleged by Ms. Faciano] to [her] medical condition" means that there is no medical evidence to

16

support Ms. Faciano's testimony of a need to lay down all or most of the day due to pain and fatigue. Although the ALJ's explanation on this point could have been more fulsome, we do not find it to be the kind of pat, conclusory statement prohibited by the case law. We therefore affirm the ALJ's credibility finding and thus her RFC finding as a result.

At the administrative hearing, the ALJ clearly emphasized that she wanted the VE to answer the question of whether a person with Ms. Faciano's limited RFC could perform the telemarketing position with a sit/stand option; and, in response, the VE clearly stated that the telemarketing position existed at the light level with the sit/stand option in the range of 2-3,000 jobs in the local/regional economy (R. 34) and also at the sedentary level (R. 36). This testimony provides substantial evidence for the ALJ's conclusion that the telemarketing position exists with a sit/stand option that would accommodate Ms. Faciano's limited RFC. The VE also testified that there were two other jobs that Ms. Faciano could perform with her limited sit/stand RFC, namely, the information clerk and gate guard receptionist (R. 37). This testimony also provides substantial evidence for the ALJ's conclusion that these two positions exist with a sit/stand option. We therefore find substantial evidence for the ALJ's determination that Ms. Faciano is not disabled.

**B.**

Last, we address Ms. Faciano's argument that we should reverse and remand to consider new and material evidence of disability not considered by the ALJ or the Appeals Council. Under the regulations, the Appeals Council must "evaluate the entire record," including "new and material evidence," in determining whether to grant review. 20 C.F.R. § 404.970(b); *Sims v. Apfel*, 530 U.S. 103, 111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Sentence six of 42 U.S.C. § 405(g) allows a remand to the agency "upon a showing that there is new evidence which is material and that there

is good cause for the failure to incorporate such evidence into the record in a prior proceeding." "New" evidence is evidence which was "not in existence or available to the claimant at the time of the administrative proceeding." *Simila v. Astrue*, 573 F.3d 503, 522 (7th Cir. 2009); *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). New evidence is 'material' if there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." *Simila*, 573 F.3d at 522; *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005).

Ms. Faciano has not shown the Court that the evidence she seeks for us to consider is either new or material under these legal standards. We therefore deny her motion to reverse and remand on that basis.

## CONCLUSION

The Court therefore reverses and remands the ALJ's determination denying Ms. Faciano disability benefits under Title II (DIB) and Title XVI (SSI) of the Social Security Act (R. 113-24). We therefore deny Ms. Faciano's motion to reverse and remand (doc. # 23) and grant the Commissioner's cross-motion for summary judgment to affirm (doc. #34).

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: June 21, 2011